IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RICHARD BELL, JR., | CASE NO. 1:22-cv-723 |
| Plaintiff, | DISTRICT JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Richard Bell Jr. filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

**Procedural history**

In May 2020, Bell filed applications for Disability Insurance Benefits and Supplemental Security Income alleging a disability onset date of April 10,

2012,[1] and claiming he was disabled due to anxiety, bipolar disorder, gastroparesis, diabetes, and neuropathy. Tr. 581, 585, 617. The Social Security Administration denied Bell's application and his motion for reconsideration. Tr. 428–31. Bell then requested a hearing before an Administrative Law Judge (ALJ). Tr. 508.

In June 2021, Bell amended his alleged onset date to March 23, 2020. Tr. 603. In August 2021, an ALJ held a hearing. Bell and a vocational expert testified. Tr. 385–409. The next month, the ALJ issued a written decision finding that Bell was not disabled. Tr. 455–77. Bell appealed. Tr. 574. The Social Security Appeals Council accepted review and considered a letter from Bell's doctor, Deon Regis, M.D., that the ALJ had not considered. Tr. 576–77. On March 16, 2022, the Appeals Council adopted the ALJ's findings and conclusions, and the Agency decision became final on that date. Tr. 4-7; *see* 20 C.F.R. § 404.981.

Bell filed this action on May 4, 2022. Doc. 1. He asserts the following assignments of error:

> 1. Whether the Appeals Council (and the administrative law judge before it) erred in finding Mr. Bell could sustain work on a regular and continuing basis at even a sedentary level of exertion where both the treating physician and the treating specialist indicated a level of absenteeism incompatible with competitive employment, these opinions are supported and consistent with the record as a whole, and no other opinion speaks to Mr. Bell's ability to sustain work?

---

[1] "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

2. Whether the Appeals Council (and the administrative law judge before it) erred in the evaluation of pain and other symptoms where the decision discounted the symptoms caused by Mr. Bell's gastroparesis and failed to build a logical bridge between the evidence and the ultimate conclusions concerning residual functional capacity?

Doc. 9, at 1.

**Evidence**

*1. Personal and vocational evidence*

Bell was born in 1984 and was 37 years old on the date of the administrative hearing. Tr. 6. He completed seventh grade and used to work as a cook. Tr. 406, 476.

*2. Medical evidence[2]*

Bell's medical conditions include bipolar disorder, depressive disorder, anxiety disorder, diabetes mellitus type II with neuropathy, obesity, sleep apnea, chronic abdominal pain, and gastroparesis.[3] Tr. 6. Bell has a history of

---

[2] The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. Bell only challenges the ALJ's decision as to his gastrointestinal issues, so I only recite that evidence.

The transcript in this case is over 4,000 pages long. The parties primarily present their recitation of the medical evidence grouped into date ranges, rather than descriptions of visits on specific dates. I follow that practice. Some date ranges overlap, although I have tried to present the evidence in chronological order as much as possible.

[3] Gastroparesis causes food to move abnormally slowly from the stomach to the small intestine. *See* https://health.clevelandclinic.org/how-does-a-smart-pill-help-diagnose-your-gastroparesis/ (last visited Nov. 29, 2022).

nausea and vomiting, and in July 2019 he had a gastric emptying study that showed gastroparesis.[4] Tr. 889, 1174–76.

During the year before Bell's alleged disability onset date of March 23, 2020, Bell visited the emergency room 30 times to treat his gastroparesis symptoms of nausea, vomiting, and abdominal pain. Doc. 9-1. Twenty times he was treated and discharged; 10 times he was hospitalized. *Id*.

In January 2020, Cleveland Clinic gastroenterologist Michael Cline, D.O., administered a "SmartPill" test to assess Bell's gastroparesis.[5] Tr. 781. Bell had "global dysmotility. All 3 parts are slow." Tr. 781. The test ended early because Bell had trouble breathing and started vomiting. Tr. 782. He had to be intubated and was admitted to the intensive care unit. Tr. 782.

Between March and April 2020, Bell visited the emergency room 6 times for nausea, vomiting, and abdominal pain. Doc. 9-2, at 1. Four times he was treated and discharged; twice he was hospitalized. *Id*. At a visit on April 2, physical and occupational therapists could not evaluate Bell because he was "actively vomiting." Tr. 1467. Bell was diagnosed with "intractable nausea and vomiting setting of uncontrolled diabetes and gastroparesis." Tr. 1404. He also had anxiety and took Xanax. Tr. 1431, 1460. At certain hospital visits he had

---

[4]     Bell had a second gastric emptying study done a few weeks later that was normal. Tr. 889, 3050.

[5]     A "SmartPill" test requires a patient to swallow the "SmartPill," which measures intestinal motility as it moves through the digestive system, wirelessly transmitting data. *See* https://health.clevelandclinic.org/how-does-a-smart-pill-help-diagnose-your-gastroparesis/ (last visited Nov. 29, 2022).

hyperglycemia, dehydration, and moderate malnutrition. Tr. 1460, 1481. Bell had a history of diabetes non-compliance and was morbidly obese from excessive calorie intake. Tr. 1460, 1466.

Between August 2020 and September 2020, Bell visited the emergency room 6 times for nausea, vomiting, abdominal pain, and anxiety. Doc. 9-2, at 2. Five times he was treated and discharged; once he was hospitalized. *Id.*

In September 2020, Bell had a virtual visit with Dr. Cline. Tr. 3052. Bell reported that his primary care doctor had prescribed Raglan, which helped him keep food down, but Dr. Cline wrote that Raglan wasn't a viable option because it was contraindicated with Bell's other medication. Tr. 3052, 3054. Dr. Cline referred Bell to Matthew Allemang, M.D., to discuss a per-oral pyloromyotomy procedure.[6] Tr. 3053.

The next day, Bell saw Dr. Allemang, who recommended a per-oral pyloromyotomy procedure for Bell's gastroparesis. Tr. 3051. Bell was scheduled to have the procedure on October 6. Tr. 3042–47.

---

[6]    A per-oral pyloromyotomy "is a nonsurgical procedure in which the doctor inserts an endoscope … into the patient's mouth and advances it to the stomach. The doctor then cuts the pylorus, the valve that empties the stomach, which allows food to move from the stomach to the small intestine more easily." *See* https://my.clevelandclinic.org/clinical-trials/1525-per-oral-pyloromyotomy-pop-in-the-treatment-of-medical-refractory-gastroparesis--a-randomized-sham-controlled-trial (last visited Nov. 29, 2022).

On October 6, 2020, Bell had an esophagogastroduodenoscopy and a biopsy was taken.[7] Tr. 3064-66. Bell had large amounts of bilious fluid in his stomach and "localized moderate inflammation characterized by erosions and erythema … in the gastric fundus." Tr. 3066. The biopsy showed "mild chronic inactive gastritis." Tr. 3061. A week later, Bell had a CT scan of his abdomen and pelvis, which were unremarkable and showed no acute abdominal pathology. Tr. 3095, 3111.

On October 15, 2020, Dr. Cline completed a "Medical Source Statement: Physical Abilities and Limitation" on Bell's behalf. Tr. 3029. Dr. Cline wrote that he treated Bell for chronic abdominal pain and gastroparesis. Tr. 3029. Dr. Cline opined that Bell couldn't work any hours per week because he had just had endoscopic surgery. Tr. 3029. Bell would be absent from work at least 3 days a month due to pain, nausea, and vomiting. Tr. 3029. He could stand and walk 10 minutes at a time for a total of one hour in an 8-hour workday. Tr. 3029–3030. Bell had no difficulty sitting. Tr. 3030. He could lift and carry 5 pounds occasionally and one pound frequently because of pain, nausea, and vomiting. Tr. 3030.

In late October 2020, Bell was interested in transferring his pain management care and went to a new clinic for an initial evaluation. Tr. 4307.

---

[7]     It's not clear from the record whether Bell had a per-oral pyloromyotomy. An esophagogastroduodenoscopy is an upper endoscopy. *See* https://my.clevelandclinic.org/health/diagnostics/22549-esophagogastroduodenoscopy-egd-test (last visited Nov. 29, 2022).

Bell said that his abdominal pain fluctuated in intensity and that day Bell rated his pain as 1 out of 10. Tr. 4307. The doctor recommended stretching, strengthening, and resistance exercises for Bell's back and abdominal muscles, and a home exercise program that included walking 30 minutes twice daily followed by walking stairs for 10 minutes. Tr. 4311.

Between October 2020 and July 2021, Bell visited the emergency room 16 times for nausea, vomiting, abdominal pain, and anxiety. Doc. 9-2, at 3–5. Twelve times he was treated and discharged; 4 times he was hospitalized. *Id*. During that period, Bell once went to an emergency room hours after he had been discharged because he had an "altered state"; he had a normal abdominal exam but he appeared ill and dehydrated. Tr. 3095–97. Once Bell had mild diabetic ketoacidosis[8] and mild acute kidney injury and chronic kidney disease. Tr. 3786. Bell had a normal gait during this period. *E.g.*, Tr. 3126, 3138. Bell was assessed as having normal muscle strength, but was also observed to have a "[s]light decreased muscle mass across the thigh and lower extremity consistent with muscle wasting and diabetes." Tr. 3139.

In December 2020 Bell had a virtual appointment with Nurse Mize, APRN, CNP, at Mercy Health Medical Partners for his gastrointestinal issues.

---

[8]     Diabetes-related ketoacidosis happens when a body doesn't have enough insulin to use sugar for energy. So the body breaks down fat for energy, which causes the body to release ketones. Too many ketones cause blood to turn acidic.     *See*     https://my.clevelandclinic.org/health/diseases/21945-diabetic-ketoacidosis-dka (last visited Nov. 29, 2022).

Tr. 3614. Bell advised that he stopped seeing Dr. Cline and decided to transfer his care to Mercy Health because it was closer to his home. Tr. 3614. Bell reported he had "epigastric pain" that "typically" occurred in the morning 1-2 days per week. Tr. 3614. A different treatment note memorializing the same visit with the nurse indicates that Bell's "abdominal pain" always starts in the morning, sometimes goes away, but most days does not.[9] Tr. 4105. Bell took multiple medications. Tr. 3614. At times during doctors' appointments Bell denied abdominal pain, Tr. 3222, and at times his physical exam showed no abdominal abnormalities, Tr. 3114.

In early February 2021, Bell had a follow-up telehealth visit with his primary care physician Deon Regis, M.D. Tr. 3668. Bell reported that since his hospitalization in October 2020, he felt "significantly fatigued." Tr. 3668. He said it was difficult to stand or move for longer than 20 minutes because of dull abdominal pain and feeling weak, although he reported "no strength deficit." Tr. 3668. Bell said he had been "doing well" as for his chronic nausea and abdominal pain. Tr. 3668. His vomiting was "now occasional instead of persistent" and he had normal bowel movements. Tr. 3668. Bell's mood was "stable and improved." Tr. 3668.

In late April 2021, Bell saw Dr. Regis again and reported persistent fatigue and morning headaches. Tr. 3690. Bell told Dr. Regis that he recently

---

[9] It is not clear whether Bell's pain reports are inconsistent, whether "abdominal" pain is different from "epigastric" pain, or whether the nurse's treatment notes are inconsistent.

had a sleep study that showed significant sleep apnea. Tr. 3690. Bell denied abdominal pain, nausea, and vomiting. Tr. 3694. Dr. Regis ordered a titration study to expedite Bell's need for a CPAP machine for sleep apnea. Tr. 3695.

On May 12, 2021, Bell went to the emergency room at around 2:00 a.m. for an anxiety attack. Tr. 3709. He denied abdominal pain, nausea, and vomiting, and was discharged. Tr. 3700, 3775. That evening, Bell returned to the emergency room complaining of abdominal pain, nausea, vomiting, and diarrhea since "early this morning." Tr. 3775. The treatment note recites Bell's medical history, including a history of "diabetic gastroparesis, type 2 diabetes with noncompliance." Tr. 3775. Upon exam, Bell was not in acute distress and was "not ill appearing, toxic appearing, or diaphoretic." Tr. 3780. Bell had generalized abdominal tenderness but no abdominal distension. Tr. 3781. He was admitted to the hospital. Tr. 3784. An abdominal CT scan showed hepatic steatosis and bowel wall thickening that "may reflect colitis" but no evidence of obstruction. Tr. 3787. Bell's symptoms resolved and Bell was discharged the next morning after "significant improvement" in his condition. Tr. 3787.

The next day, Bell returned to the emergency room because of continued nausea and vomiting. Tr. 3897. Bell was given intravenous hydration and anxiety medication and improved. Tr. 3904. He was discharged that day. Tr. 3905.

Four days later Bell went to the emergency room for nausea, vomiting, and abdominal discomfort. Tr. 3963. Bell initially appeared nauseated and had

9

mild abdominal tenderness with "[n]o guarding rebound or rigidity." Tr. 3964. A nurse remarked that Bell "seemed qui[et] in bed then mother entered room and he started thrashing around moaning." Tr. 3965. Bell said that he recently ate "suspected bad sushi" and thought it could have "exacerbated his stomach issues." Tr. 3695. He was discharged in stable condition and was advised to follow-up with his gastroenterologist. Tr. 3992.

A week later, in late May 2021, Bell had a telehealth visit with Nurse Mize at Mercy Health Hospital. Tr. 4067. Mize wrote that Bell was "[c]urrently…asymptomatic" and "tolerating [his] diet without any further epigastric pain, nausea, []vomiting, or dehydration." Tr. 4067. Bell was "optimized on [gastrointestinal] medications." Tr. 4067. Mize advised Bell to continue his medications and diet. Tr. 4073. Mize noted that Bell's abdominal pain was "currently at baseline" and that he should consult with pain management or his primary care physician for further evaluation. Tr. 4073. Bell was to follow up in 6 months.[10] Tr. 4073.

On June 22, 2021, Bell went to the emergency room complaining of vomiting and some mild diffuse abdominal pain for the past 3 days. Tr. 4200. He reported that he couldn't keep his medication down due to vomiting. Tr. 4200. Bell's abdomen wasn't tender or distended and he had normal bowel

---

[10]  Bell describes this visit with Nurse Mize very differently. Doc. 9, at 9. Bell writes that he was "visibly dry heaving" and that his mother reported that Bell dry heaved most of the time and had difficulty eating and drinking. *Id*. But that description is from a portion of the treatment note describing a visit at Mize's office in 2019. Tr. 4068.

sounds. Tr. 4204. On June 28, Bell visited the emergency room for abdominal pain and vomiting. Tr. 4159. He had recently started a new antibiotic his doctor prescribed. Tr. 4159. Bell's exam showed minimal abdominal tenderness in the epigastric area. Tr. 4165–66.  On July 2, Bell went to the emergency room for vomiting. Tr. 4294. Bell's abdominal exam was normal. Tr. 4299.

In late July 2021, Dr. Regis completed a "Medical Source Statement" on Bell's behalf. Tr. 4340. Dr. Regis stated that he had treated Bell for three years for Bell's chronic abdominal pain, hypertension, anxiety, depression, gastroparesis, and type 2 diabetes. Tr. 4340. Dr. Regis wrote that Bell could stand and walk for 20 minutes at a time for 2 hours total in an 8-hour workday and sit for 2 hours at a time and 2 hours total in an 8-hour workday. Tr. 4340. Bell could lift up to 10 pounds and occasionally reach and handle. Tr. 4340. Dr. Regis stated that Bell had chronic abdominal pain that makes it "unreasonably difficult for him to consistently work" and he would be absent four or more days per month. Tr. 4340. To support his opinions, Dr. Regis explained that Bell "has multiple [emergency room] visits a month due to exacerbation" of his gastrointestinal issues and anxiety. Tr. 4340. Bell spent most of the day in bed because he can't sit or stand for "prolonged periods of time"—"all [those] movements … exacerbate [Bell's] pain." Tr. 4340.

### 3. Non-medical evidence

In September 2020, Bell's employer wrote a letter to Bell explaining that his employer was ending his employment because of Bell's extended

11

absences. Tr. 632. The employer stated that it had "gladly allowed your extended absences during the past 2½ years and welcomed you back each time," but the "upheaval and turmoil" caused by Bell's absences could no longer be accommodated. Tr. 632.

In a July 2020 function report, Bell's mother wrote that Bell's impairments affected his ability to lift, squat, bend, reach, and kneel. Tr. 630. Bell's mother indicated that Bell could walk for "about 15 minutes" before he had to stop and rest for 25 minutes before he could resume walking. Tr. 630.

### 4. *State agency opinions*[11]

In July 2020, Leon Hughes, M.D., reviewed Bell's record and assessed his physical residual functional capacity (RFC).[12] Dr. Hughes found that Bell could stand, walk, and sit for about 6 hours in an 8-hour workday and lift and carry 20 pounds occasionally and 10 pounds frequently. Tr. 415. Bell also had postural limitations. Tr. 415.

---

[11]  When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[12]  An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

In January 2021, Mehr Siddiqui M.D., reviewed Bell's record and adopted most of Dr. Hughes's opinion, but Dr. Siddiqui assessed greater postural limitations and found that Bell could stand and walk for only 4 hours in an 8-hour workday. Tr. 448–49.

    *5.    Hearing testimony*

Bell, who was represented by counsel, testified at the telephonic administrative hearing held in August 2021. Bell lives in an apartment with his mother. Tr. 390. He used to work as a cook but was fired because he missed too much work—about 4 or 5 days per month. Tr. 392. On those days he "wasn't able to move" because he was vomiting. Tr. 392. The more his stomach hurt, the more anxious he became—he has anxiety and panic attacks. Tr. 392. His anxiety and depression started when his stomach problems started. Tr. 398.

The ALJ referenced Bell's emergency room visits the past few years and asked Bell whether he had been told why he experiences abdominal symptoms. Tr. 393. Bell replied that "most of it was gastroparesis" and they could only treat him with "liquids and fluids and stuff for anxiety attacks." Tr. 393. The emergency room visits "were just putting a band-aid on it—on the pain when it got too much." Tr. 393. When asked if he ever told Dr Regis that the "band-aid" treatment wasn't working, Bell said that he did, and that Dr. Regis referred Bell to doctors at the Cleveland Clinic. Tr. 393. But, according to Bell, those doctors don't know how to stop his pain. Tr. 393. "They just keep it under control." Tr. 393. When asked if he notices a pattern, "like if I do this, I know

13

I'm going to end up in the ER," Bell answered no, his emergency room visits just happen randomly. Tr. 394. Sometimes he needs to visit the ER after lying in bed reading and at other times, he needs to visit after he "tr[ies] to do more than [he] can"—things like cleaning the house, cooking, or sitting in the living room. Tr. 394. Lying down helps the most; being active makes his condition the worst. Tr. 394.

When asked about his diet for his diabetes, Bell said that he eats very soft foods. Tr. 394. He can't have raw vegetables or nuts, seeds, or hulls. Tr. 394–95. When asked if he can cook for himself, Bell stated, "Yes, but not as often as I would like." Tr. 395. Bell also takes insulin. Tr. 394. When asked what he does for pain management, Bell stated, "I take a lot of pills." Tr. 396. When Bell experiences symptoms, he tries to focus on other things—he watches his fish tank, listens to music, or reads. Tr. 396. Some days those distractions work; some days they don't and Bell goes to the emergency room. Tr. 396. When asked what he did at work when he experienced symptoms, Bell explained that his mom used to come and help him every day. Tr. 396, 401. He would sit in a chair and direct her. Tr. 396–97. Lifting boxes, pots, and pans; sorting food; and navigating steps caused problems. Tr. 397.

Bell's weight fluctuated. Tr. 399. He used to weigh 230 pounds, then he was down to 200 pounds, and then "it went back up to 340" pounds. Tr. 399. When asked why he gained so much weight, Bell stated that he ate a lot of pasta—it's the only thing that didn't upset his stomach and "felt good going

14

down." Tr. 399. He hasn't lost weight because he isn't able to move much. Tr. 399. When he worked, he walked back and forth from home to his job and was more active. Tr. 399. But now he can barely walk up the steps to his apartment. Tr. 399.

Bell stated that he stopped seeing Dr. Cline at the Cleveland Clinic because he wanted to get another opinion, but that new provider sent Bell back to the Cleveland Clinic. Tr. 401.

When asked how he spends a typical day, Bell stated that some days he just stays in his bed in the dark, becomes depressed, and goes to the hospital. Tr. 403. On good days he can cook or go to the grocery store. Tr. 403. He estimated that he had about 2 good days a week. Tr. 403. Bell doesn't drive, so when he goes to the hospital others take him. Tr. 403.

The ALJ discussed with the vocational expert Bell's past work as a cook. Tr. 406. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Bell could perform Bell's past work or any other work if the individual had the limitations assessed in the RFC determination, described below. Tr. 406–07. The vocational expert answered that such an individual could not perform Bell's past work but could perform the following jobs: polisher, weight tester, and ticket collector. Tr. 407. When asked if the hypothetical individual could perform full-time work if he worked less than 8 hours a day or was absent more than 2 days a month, the vocational expert answered no. Tr. 408.

15

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2. The claimant has not engaged in substantial gainful activity since March 23, 2020, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: bipolar disorder; depressive disorder; anxiety disorder; diabetes mellitus, type II with neuropathy; obesity; sleep apnea; chronic abdominal pain; and gastroparesis (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except lift and/or carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk only 4 hours in an 8 hour workday; frequently climb ramps or stairs; no climbing of ladders, ropes, or scaffolds; frequently balance and crouch; occasionally stoop, kneel, or crawl; should avoid concentrated exposure to pulmonary irritants; avoid all exposure to unprotected heights, moving mechanical parts, and dangerous machinery; limited to performing simple tasks and following simple instructions, with few if any workplace change; able to have communication with the public and coworkers, but that communication is limited to making simple decisions, and includes no arbitration,

negotiation, supervisory authority, or maintaining the safety or well-being of others.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 23, 1984, and was 27 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 23, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 457–77.

### The Appeals Council's Decision

The Appeals Council accepted Bell's request for review of the ALJ's decision and considered a letter from Bell's primary care physician, Dr. Regis, which the ALJ had not considered. Tr. 576–77. Then the Appeals Council adopted the ALJ's findings and conclusions, Tr. 4–5, and summarized its own findings:

1. The claimant met the special earnings requirements of the Act on March 23, 2020, the date the claimant stated he became unable to work and met them through December 31, 2025.

17

2. The claimant has the following severe impairments: bipolar disorder; depressive disorder; anxiety disorder; diabetes mellitus, type II with neuropathy; obesity; sleep apnea; chronic abdominal pain; and gastroparesis, but does not have an impairment or combination of impairments which is listed in, or which is medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

3. The claimant's combination of impairments results in the following limitations on his ability to perform work-related activities: the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except lift and/or carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk only 4 hours in an 8 hour workday; frequently climb ramps or stairs; no climbing of ladders, ropes, or scaffolds; frequently balance and crouch; occasionally stoop, kneel, or crawl; should avoid concentrated exposure to pulmonary irritants; avoid all exposure to unprotected heights, moving mechanical parts, and dangerous machinery; limited to performing simple tasks and following simple instructions, with few if any workplace change; able to have communication with the public and coworkers, but that communication is limited to making simple decisions, and includes no arbitration, negotiation, supervisory authority, or maintaining the safety or well-being of others.

4. The claimant's alleged symptoms are not consistent with and supported by the evidence of record for the reasons identified in the body of this decision.

5. The claimant is unable to perform past relevant work as a cook (313.361-014, medium, and SVP 7).

6. The claimant was 37 years old on the date of the hearing decision, which is defined as a younger individual and has a limited or less education. The claimant's past relevant work is semiskilled or skilled. The issue of transferability of work skills is not material in view of the claimant's age and residual functional capacity.

7.  If the claimant had the capacity to perform the full range of the sedentary exertional level, 20 CFR 404.1569 and 416.969 and Rule 201.25, Table No. 1 of 20 CFR Part 404, Subpart P, Appendix 2, would direct a conclusion of not disabled. Although the claimant's exertional and nonexertional impairments do not allow him to perform the full range of the sedentary exertional level, using the above-cited Rule as a framework for decisionmaking, there are a significant number of jobs in

18

the national economy which he could perform, such as: polisher (713.684-038, sedentary, SVP 2, and 30,000 jobs nationally); weight tester (539.485-010, sedentary, SVP 2, and 77,000 jobs nationally); and ticket checker (219.587-010, sedentary, SVP 2, and 920,000 jobs nationally).

8. The claimant is not disabled as defined in the Social Security Act at any time through August[] 25, 2021, the date of the Administrative Law Judge's decision.

Tr. 6–7.

Because the Appeals Council adopted the ALJ's findings and conclusions, the parties direct their arguments to the ALJ's decision. Doc. 9, at 12; Doc. 10, at 8, n.2. So I review the ALJ's decision when considering the parties' arguments.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

The Social Security Administration is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

19

2.      Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.      Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.      What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.      Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the" agency. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

Bell submits that during the relevant period—March 2020 through July 2021—he visited the emergency room 22 times and was admitted on several occasions for an additional 17 days. Doc. 9, at 16. Bell calculates that during that 16-month period he received emergent care on at least 39 days, which is

more than 2 days a month. *Id*. The Commissioner doesn't dispute Bell's calculations.

The vocational expert testified at the hearing that a hypothetical individual like Bell could not perform full-time, competitive work if he missed more than 2 days of work per month. Tr. 408. The ALJ did not include a limitation in his RFC assessment addressing work absences. Tr. 465. Bell challenges the ALJ's failure to include a limitation for absenteeism on 2 grounds—the opinion evidence and Bell's allegations of symptoms.

### 1. The ALJ erred when he evaluated Dr. Cline's and Dr. Regis's opinions

Bell argues that the ALJ erred when he evaluated the opinions of Bell's gastroenterologist, Dr. Cline, and Bell's primary care physician, Dr. Regis. Doc. 9, at 13. Dr. Cline stated that Bell would miss 3 or more days of work per month due to nausea, vomiting, and chronic pain. Tr. 3029. Dr. Regis wrote that Bell would miss 4 or more days of work per month due to chronic pain and explained that Bell has multiple emergency room visits every month from "exacerbations of abdominal pain, gastroparesis, nausea, vomiting, and inability to eat or drink." Tr. 4340. The ALJ found that both doctors' opinions were unpersuasive, Tr. 474–75.

The ALJ wrote that Dr. Cline assessed Bell with limitations for standing, walking, sitting, lifting, and absenteeism based on Bell's "chronic pain" and explained that the record did not support Dr. Cline's limitations. Tr. 474–75. But the ALJ ignored Dr. Cline's opinion that Bell's excessive

absenteeism was also due to nausea and vomiting. Tr. 3029. So the ALJ did not explain how the record, detailing numerous emergency room visits for nausea and vomiting, didn't support Dr. Cline's opinion that Bell would have excessive absences from work due to nausea and vomiting.

The ALJ recognized that Dr. Regis cited Bell's multiple emergency room visits to support Dr. Regis's opinion that Bell would have excessive absences from work. Tr. 475. But the ALJ didn't explain why he rejected that explanation. Instead, the ALJ wrote that Dr. Regis's opinion was inconsistent with his own treatment notes showing that Bell had unremarkable cardio, pulmonary, neurological, and psychological findings. Tr. 475. The ALJ also wrote that other treatment notes in the record show that Bell had "no significant deficits in strength, sensation, reflexes, gait, range of motion, or otherwise." Tr. 475. That explanation doesn't address Dr. Regis's opinion that Bell would have excessive absences because of emergency room visits due to nausea and vomiting.

So the ALJ's evaluation of both doctors' opinions that Bell would have excessive work absences didn't comport with the regulations. *See* 20 C.F.R. § 416.920c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions"); *Toennies v. Comm'r of Soc. Sec.*, No. 1:19-CV-2261, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) ("A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the

persuasiveness of a medical opinion.") (internal quotation marks and citation omitted).

Although the ALJ's decision should be read as a whole, *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016), the ALJ didn't supply an explanation elsewhere in his decision to explain why he rejected the doctors' opinions on absenteeism. At the outset of his decision, the ALJ wrote:

> The claimant's representative has argued that the claimant is disabled due to the inability to sustain full-time employment, citing to opinions suggesting that the claimant is unable to sustain exertion for a total of 8 hours per day and/or has work-preclusive absenteeism. The undersigned considered the arguments of the claimant's representative from the hearing and as set forth in Exhibit 13E; however, *for the reasons explained in this decision,* the representative's arguments are not persuasive. While the record contains a significant amount of treatment, the overall theme is that when the claimant presents to the ER and hospital, there are few findings to support the medical necessity of those visits. In other words, the number and frequency of medical visits during the period at issue, is not necessarily indicative of functional limitations. In this case, the medical evidence does not support greater limitations than those set forth in the above residual functional capacity assessment.

Tr. 466–67 (emphasis added). But the ALJ's decision doesn't live up to his description of it—the ALJ *didn't* provide reasons that discussed how Bell's emergency room visits for vomiting and nausea squared with the ALJ's rejection of the doctors' opinions that Bell would have excessive absences due to nausea and vomiting. Some emergency room notes documented Bell's vomiting, dehydration, vomiting-induced anemia, and other abnormal laboratory findings. *See, e.g.*, Tr. 1411–12, 1460, 1467, 1481 (vomiting, mild dehydration, hyperglycemia, and moderate malnutrition during April 2020

hospitalization); Tr. 3097 (vomiting in the emergency room in October 2020); Tr. 3784–86 (admitted for intractable vomiting and diabetic ketoacidosis, noted to be dehydrated and anemic in May 2021). While the ALJ mentioned those records, Tr. 468–69, the ALJ didn't articulate how they factored into his decision or provide a relevant conclusion. Instead, the ALJ just focused on Bell's normal gait, strength, and reflexes. Tr. 468. So the ALJ failed to "build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (holding that a court cannot uphold an ALJ's decision, even when there may be sufficient evidence to support it, if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result"); *see Ripley v. Comm'r of Soc. Sec.*, 415 F. Supp. 3d 752, 767 (N.D. Ohio 2019).

The Commissioner asserts that "the Sixth Circuit and courts in this district have found that opinions regarding absences and breaks at a work-preclusive frequency are essentially 'tantamount to a disability opinion,' and should therefore be treated the same as other issues reserved to the Commissioner." Doc. 10, at 12. But the cases the Commissioner cites don't support her broad assertion. In *Sims v. Comm'r of Soc. Sec*, 406 F. App'x 977, 979–80 (6th Cir. 2011), the ALJ correctly noted that a doctor's opinion that the claimant could not work an 8-hour shift due to back and leg pain was based on the claimant's subjective reports. The Court also wrote, in a footnote, "Dr. Spencer's implied opinion that plaintiff was unable to work is tantamount to a

disability opinion, a matter reserved to the Commissioner for determination." *Id.* at 980, n.1. Here, the doctors' opinions were not based on subjective complaints—they were supported by the record, which showed an average of more than 2 emergency room visits a month.

In *Littleton v. Comm'r of Soc. Sec.*, No. 5:12-CV-2756, 2013 WL 6090816, at *10 (N.D. Ohio Nov. 19, 2013), the court found that a doctor's opinion that the claimant would miss more than 3 days of work per month was not a *medical opinion*—it was an opinion as to *employability*, which is an issue reserved to the Commissioner. But the court cautioned:

> In some circumstances, the Court recognizes that an opinion as to the number of days a claimant would miss may be more akin to a medical opinion than an opinion as to a claimant's employability. Where, due to the normal course of treatment for an impairment or impairments, a patient has actually missed or is scheduled to miss a certain number of days, the physician's opinion is not the product of conjecture and rather a *bona fide* medical opinion.

*Id.* at 11, n.4. Here, Bell actually missed at least 2 days of work per month due to his emergency room visits for his gastroparesis symptoms of nausea and vomiting. So *Littleton* supports Bell's assertion that his doctors' opinions about his excessive absences are *medical opinions* the ALJ was required to evaluate. *See also Saulic v. Colvin*, No. 5:12-CV-2753, 2013 WL 5234243, at *9, n.6 (N.D. Ohio Sept. 16, 2013).[13]

---

[13]    The Commissioner also cites *Chhay v. Colvin*, No. 1:13-CV-2229, 2014 WL 4662024, at *6–8 (N.D. Ohio Sept. 17, 2014). Doc. 10, at 12. But the *Chhay* court did not decide whether the doctor's opinion that the claimant would miss 4 days of work per month was a *medical opinion*. Instead, the court described the competing approaches by other courts; assumed the opinion was a *medical*

2.     *The ALJ erred when he evaluated Bell's reports of symptoms*

Bell also challenges the ALJ's evaluation of Bell's reports of symptoms. Doc. 9, at 18. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2016 WL 1119029, at *4 (March 16, 2016); 20 C.F.R. § 404.1529. *Other relevant evidence* includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-CV-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)).

The ALJ's evaluation of Bell's reports of nausea and vomiting is insufficient for the same reasons as above—the ALJ didn't explain why he didn't credit Bell's numerous visits to the emergency room.

---

*opinion*; and found that the ALJ provided "good reasons" for rejecting it. 2014 WL 4662024, at *8.

Bell also complains that the ALJ found Bell's allegations not credible based on a comment Bell made to a psychological consultative examiner in October 2019, 5 months before his alleged onset date. Doc. 9, at 19 (citing Tr. 470). Bell told the examiner that he worked only 20 hours a week because "that's all the hours they offer." Tr. 470, 688. The ALJ found that that "inconsistency" undermined Bell's allegations. Tr. 470. But the ALJ didn't reconcile Bell's statement in October 2019 with the September 2020 letter Bell's former employer wrote advising Bell that the employer was terminating Bell's employment due to his "extended absences during the past 2½ years," which the employer could no longer accommodate. Tr. 632. So the ALJ's reliance upon Bell's statement to the consultative examiner in October 2019 does not, without more, undercut Bell's allegations regarding Bell's symptoms.

The Commissioner argues that the ALJ's symptom evaluation was sufficient. In support, the Commissioner points to a few, stray comments that the ALJ made. Doc. 10, at 15–16. Those comments, described below, don't satisfy the ALJ's duty to evaluate Bell's reports of symptoms.

The ALJ wrote, "The claimant was noted with 'noncompliance w/medication treatment due to intermit use of medication' and [']noncompliance with diabetes treatment (chronic)' (12F/2)." Tr. 469. The record the ALJ cites is one page of a 7-page printout of Bell's "Problem List" from Mercy Hospital attached to a treatment note from a February 2021 visit with Dr. Regis. Tr. 3652–58. It shows that Bell was assessed with non-

compliance in April 2019, a year before Bell's alleged disability onset date. Tr. 3658. Neither the ALJ, nor the Commissioner, identify a record in the over-4,000-page transcript assessing Bell with noncompliance during the relevant period. Instead, the records recite his "history" of non-compliance, which was assessed in April 2019. So the ALJ's comment—with weak record support, in a separate paragraph unattached to any discussion or conclusion—is insufficiently supported and explained. *See* SSR 16-3p, 2016 WL 1119029, at *9 ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

The ALJ commented that on April 15, 2020, Dr. Cline wrote that, despite Bell's "feeling" that he had lost weight, Bell "gained a tremendous amount of weight by the charting." Tr. 468, 774. But this was a virtual visit, so Bell's weight wasn't taken and it's not clear what "charting" Dr. Cline referenced. And the "charting" is inconsistent. An emergency room treatment note from April 1, 2020, says that Bell weighed 270 pounds and a hospital treatment note from April 3, 2020, says that he weighed 265 pounds. Tr. 1460, 1468. But a hospital treatment note from April 5, 2020, says that Bell weighed 370 pounds. Tr. 1406. It is unlikely that Bell gained 100 pounds in 2 days. Also, while the Commissioner insinuates that Bell's weight gain undercuts his reports of

vomiting, Doc. 10, at 18, the ALJ didn't make that connection. *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 808 (6th Cir. 2018) ("[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself, and not based on appellate counsel's post hoc rationalization[s]") (internal quotation marks and citations omitting).

Finally, the ALJ correctly noted that Bell sometimes denied "gastrointestinal issues," as the Commissioner points out. Doc. 10, at 18 (citing Tr. 468). But that fact notwithstanding, the evidence shows that Bell often reported gastrointestinal issues and that he visited the emergency room on numerous occasions because of them. It is also true, as the Commissioner points out, that the ALJ cited an emergency room note that Bell's mother reported that Bell was "acting out" and "faking seizures." Tr. 468. But Bell was at the emergency room that time because of an "altered mental state," not for gastrointestinal issues. In any event, Bell was observed to have "bilious vomiting" in the emergency room during that visit, as the ALJ remarked. Tr. 468. If the ALJ was insinuating that Bell was faking his symptoms, as the Commissioner appears to suggest, the ALJ did not make that finding. If indeed the ALJ believes that is the case, the ALJ must say so. *See Hicks*, 909 F.3d at 808.

**Conclusion**

For the reasons explained above, I recommend that the Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

Dated: November 29, 2022

                             */s/ James E. Grimes Jr.*
                             James E. Grimes Jr.
                             U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).